**PIEDMONT & N. RY. CO. v. UNITED STATES.**

District Court, W. D. South Carolina. January 15, 1929.

No. 208.

Charles E. Hughes, of New York City, Cameron Morrison, Norman A. Cocke, R. S. Hutchison and W. S. O'B. Robinson, Jr., all of Charlotte, N. C., and H. J. Haynsworth, all of Greenville, S. C., for Piedmont & N. Ry. Co.

The Attorney General and Blackburn Esterline, of Washington, D. C., and Joseph A. Tolbert, of Greenville, S. C., for the United States.

Daniel W. Knowlton, of Washington, D. C., for Interstate Commerce Commission.

W. N. McGehee, of Washington, D. C., S. S. Alderman, of Greenboro, N. C., Blythe & Bonham, of Greenville, S. C., and S. R. Prince and L. E. Jeffries, both of Washington, D. C., for Southern Ry. Co.

James F. Wright, of Norfolk, Va., for Seaboard Air Line R. Co.

F. B. Grier, of Greenwood, S. C., for Charleston & W. C. Ry. Co.

Carl H. Davis, of Wilmington, N. C., for Atlantic Coast Line R. Co.

Wm. C. Burger, of Louisville, Ky., for Louisville & N. R. Co.

James J. McLaughlin, of Johnson City, Tenn., for Carolina, C. & O. Ry., Carolina, C. & O. Ry. of South Carolina, and Clinchfield & N. Ry. of Kentucky.

Before WADDILL and NORTHCOTT, Circuit Judges, and SOPER, District Judge.

SOPER, District Judge. Piedmont & Northern Railway Company, a South Carolina corporation, filed a petition against the United States, under the provisions of the Act of October 22, 1913, c. 32, 38 Stat. 219, U. S. C. Title 28 (28 USCA) § 41, subd. (28), and sections 43 to 48, to enjoin, set aside, and annul an order of the Interstate Commerce Commission. A court of three judges was accordingly organized. The order complained of denied to the petitioner a certificate that the present or future public convenience and necessity requires or will require certain extensions of its railroad lines which it desires to build.

The corporation owns and operates a line of electric railway in South Carolina, extending from Greenwood to Spartanburg, a distance of 89.9 miles, with a branch from Belton to Anderson of 11.3 miles; and also a line of electric railway in North Carolina extending from Gastonia to Charlotte, a distance of 23.5 miles, with a branch to Belmont of 3.2 miles; and uses these lines 127.9 miles in all, in the transportation of persons and property, as a common carrier, in interstate commerce. In the latter part of 1926, the corporation determined to build extensions of its road, 128 miles in length, consisting of a line of about 53 miles in length, running from Spartanburg, S. C., to Gastonia, N. C., and also a line 75 miles in length from Charlotte to Winston-Salem in the latter state. This project came to the attention of the Commission, and it notified the railway company by letter of March 8, 1927, that it would be expected to file an application for authority to do the work under paragraphs 18 to 21 of section 1 of the Interstate Commerce Act as amended by Transportation Act 1920, 41 Stat. 456, 474, 477, 478, 49 USCA § 1 (18-21). The Commission said that in its opinion the railroad was not an interurban electric railway excepted from its jurisdiction by paragraph 22 of section 1 of the act, 41 Stat. 478, 49 USCA § 1 (22). Accordingly, on March 26, 1927, the railway company filed an application for a certificate of public convenience and necessity, without prejudice, however, to its right to assert that in this respect it is not subject to the authority of the Commission. Various parties, including the states of North and South Carolina, the utilities commissioners thereof, cities and counties along the line of the proposed routes, trade organizations, and the National Association of Railroad and Utilities Commissioners, were allowed to intervene on behalf of the petitioner. The Georgia & Florida Railroad, which had theretofore been granted authority to extend its line from Augusta, Ga., to Greenwood, S. C., also intervened on the petitioner's behalf. On the other hand, the Southern Railway Company, the Atlantic Coast Line Railroad Company, the Seaboard Air Line Railway Company, the Carolina, Clinchfield & Ohio Railway of South Carolina, and the Clinchfield Northern Railway of Kentucky, the Louisville & Nashville Railway Company, and the Charleston & Western Carolina Railway Company, were allowed to intervene in opposition to the application. After extensive hearings, the Commission, on April 3, 1928, issued its report in which it reasserted its jurisdiction over the petitioner and determined that the public convenience and necessity did not require the new lines. It showed that both the existing and proposed lines of the petitioner very closely paralleled the lines of the Southern Railway Company, and that the territory involved is now adequately served by that and other railroads. The application of the petitioner was therefore denied.

In the case at bar, the National Association of Railroad and Utilities Commission-

ers has been allowed to intervene on the petitioner's behalf, while the Interstate Commerce Commission and the same railroads which opposed the application before the Commission have been allowed to intervene in support of the Commission's authority and its denial of the petitioner's application.

■ The case was submitted to the court upon the voluminous record made in the proceeding before the Commission, which, for convenience, has been reduced by counsel to narrative form. The evidence tends to show a very considerable demand for the lines of railroad which the petitioner wishes to build arising in the locality to be served; and it is indicated that local service would be improved and the industrial development of the region would be stimulated and enlarged. But, on the other hand, there is abundant proof that the present railway facilities are in all substantial particulars adequate and satisfactory, and that the increased business which it is confidently predicted that the Piedmont & Northern, if extended, would enjoy, would be taken in large measure from the steam railroads of the locality. Indeed, it is conceded that there is substantial evidence to support the Commission's finding of fact, and that it is binding if the Commission had jurisdiction of the controversy. The rule is clearly stated by Judge Parker, speaking for a similar statutory court in Anchor Coal Co. v. U. S. (D. C.) 25 F.(2d) 462, 471. He said: "Much has been said as to the binding effect of the order entered by the Commission, but the law with regard thereto is well settled. If the determination of the Commission finds substantial support in the evidence, the courts will not weigh the evidence, nor consider the wisdom of the Commission's action, which, within the scope of its jurisdiction, is conclusive, unless there be some irregularity in the proceeding or some error in the application of rules of law. Chicago R. I. & Pac. Ry. v. U. S., 274 U. S. 29, 33, 47 S. Ct. 486, 71 L. Ed. 911; Virginian Ry. Co. v. U. S., 272 U. S. 658, 47 S. Ct. 222, 71 L. Ed. 463; Western Paper Makers' Chem. Co. v. U. S., 271 U. S. 268, 46 S. Ct. 500, 70 L. Ed. 941. If, however, in making the order complained of, the Commission has exceeded its powers, or has proceeded upon an erroneous theory of law, or if its action is so manifestly arbitrary and unreasonable as virtually to transcend the authority conferred upon it, the courts are not bound by its action. Southern Pacific Co. v. I. C. C., 219 U. S. 433, 31 S. Ct. 288, 55 L. Ed. 283; I. C. C. v. Union Pacific Co., 222 U. S. 541, 32 S. Ct. 108, 56 L. Ed.

308; U. S. v. N. Y. C. R. R., 263 U. S. 603, 44 S. Ct. 212, 68 L. Ed. 470; U. S. v. New River Co., 265 U. S. 533, 540, 44 S. Ct. 610, 68 L. Ed. 1165."

Consequently, the case turns on whether the petitioner was excluded from the authority conferred on the Commission by paragraph 18 of section 1 of the act by the express terms of paragraph 22. They provide:

"18. After ninety days after this paragraph takes effect, no carrier by railroad subject to this Act shall undertake the extension of its line of railroad, or the construction of a new line of railroad, * * * unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity require or will require the construction, * * * of such additional or extended line of railroad. * * *"

"22. The authority of the Commission [so] conferred * * * shall not extend to the construction * * * of street, suburban, or interurban electric railways, which are not operated as a part or parts of a general steam railroad system of transportation."

Two substantial questions arise:

(1) Did the petitioner, within the meaning of paragraph 18, undertake the proposed extension of its lines before the expiration of 90 days after February 28, 1920, when the Transportation Act went into effect?

(2) Is the petitioner, within the meaning of paragraph 21, an interurban electric railway which is not operated as a part of a general steam system of transportation?

■ The evidence relating to the first question shows clearly that the plan for a continuous line of electric railway through the Piedmont section of North and South Carolina, from Greenwood and Anderson on the south, to Durham or Winston-Salem on the north, was conceived long before the year 1920. As early as 1910, a group of men, headed by the late James B. Duke and William S. Lee, now president of the Piedmont & Northern, having realized the possibility of a great industrial development in this section in connection with the use of hydroelectric power, formulated a project to build a high-speed electric railroad to connect with the street railway system in the cities en route. The plan was announced to the public in 1910, and various steps were taken to carry it into effect. Thus the Piedmont Traction Company was incorporated on January 6, 1910, under the general laws of North Carolina, to operate street railways by electricity

or other power, extending not more than 50 miles from Gastonia. It constructed and later conveyed to the petitioner its present line between Gastonia and Charlotte. On March 10, 1910, the Greenville, Spartanburg & Anderson Railway Company was incorporated, with like provision as to motive power, under the general laws of South Carolina. It acquired an interurban electric railway between Belton and Anderson, constructed a line between Greenwood and Greenville, and later conveyed both to the petitioner.

On January 10, 1911, J. B. Duke, W. S. Lee, and other interested persons, as managers, entered into an agreement, called the "Piedmont Syndicate," with certain subscribers to acquire, by purchase or construction, a system of railways to carry passengers and freight in the several counties in North and South Carolina, through which the present and proposed lines of the petitioner run. Stock was offered to the public, and it was explained that it was proposed to build such a line and that the syndicate was formed to buy certain lines already built which would be suitable to carry out the project. Large powers were conferred upon the managers, with discretion to determine from time to time whether it was for the interest of the syndicate to proceed with the project or abandon it.

The Piedmont & Northern Railway Company was incorporated by special act of the General Assembly of South Carolina, approved February 24, 1911 (27 St. at Large S. C. p. 373), with a capital stock of $5,000,-000, with power to construct and operate a line or lines of railway, to be operated by electricity or other motive power, beginning at a point on the North Carolina line and extending through certain counties in South Carolina to the Georgia line. A condition was imposed upon the corporation to the effect that unless it should commence actual construction of its lines in any of the counties mentioned within ten years from March 1, 1911, all rights to enter such county should expire. Power was given to construct, acquire, and operate street railways run by electricity or other motive power. The consolidation of the new company with the Greenville, Spartanburg & Anderson Railway Company, and with any other railway company chartered in any state through or near which the Piedmont & Northern proposed to pass, was expressly authorized.

About the same time, the same interests acquired street railway systems in Anderson and Greenville, S. C., and Charlotte, N. C., and secured franchises and permits in a number of towns through which the lines were to be extended. In 1913, the Winston-Salem Street Railway system was acquired.

Further evidence of an early intention to build the continuous line described is found in certain contracts executed from 1910 to 1914 between the petitioner and one or another of the intervening railways, in which permission was granted to the Piedmont & Northern to cross or use existing lines. Arrangements were made for the division of rates in the interchange of freight business.

The actual construction of the present lines took place between 1912 and 1914. The line from Gastonia to Charlotte was completed in July, 1912; that from Greenwood to Greenville in November, 1913; and that from Greenville to Spartanburg in April, 1914.

A mortgage was executed by the Piedmont & Northern on July 1, 1914, to secure a bond issue of $50,000,000. It covered the existing lines and those afterwards to be acquired or constructed. It provides for the immediate issuance of $10,000,000 of bonds against existing lines, and for the issuance of the remaining $40,000,000 from time to time, as and when other connecting lines should be constructed.

As a matter of fact, no additional lines have been constructed since the completion of the line from Greenville to Spartanburg in April, 1914, although some surveys of the proposed line in North Carolina from Gastonia, south, and Charlotte, north, were made in 1916, and some properties in Charlotte were purchased in the same year. It is explained that a number of circumstances prevented an earlier completion of the original project. The World War began in the summer of 1914. The United States entered it in April, 1917. The Piedmont & Northern Railway was taken over by the United States and operated under federal control until March 1, 1920. When the road was returned to its owners, it was not in satisfactory condition, and the first step was to rehabilitate it. New surveys were made during the latter part of 1923 and in the year 1924. It was thought that the work would begin in 1925, but on October 28, 1925, J. B. Duke died, and construction of the road was deferred until matters connected with his various interests could be adjusted. Finally on November 3, 1926, the board of directors resolved to call a meeting of the stockholders, to be held on December 8, 1926, to consider the matter, and at this meeting the construction of lines between Spartanburg and Gas-

tonia, and between Charlotte and Winston-Salem, was authorized. It was also resolved to secure an amendment of the charter of 1911 in regard to the amount of capital stock and the removal of the limitation of ten years already mentioned. These matters were covered by an act of the South Carolina Legislature of January 27, 1927 (35 St. at Large, S. C. p. 689).

The petitioner, relying upon this history of its activities, and upon the principle of law laid down in Detroit Terminal R. Co. v. Pennsylvania-Detroit R. Co. (C. C. A.) 15 F.(2d) 507, 509, contends that it had actually commenced construction in a substantial way before 1920, by the acquisition and building of its present lines; and that since this work was but a part of an entire unitary project, never abandoned, it must be held that the petitioner had undertaken the construction of the proposed extension long before paragraph 18 of section 1 of the act was passed.

The Commission has given effect to the exception in paragraph 18 in the public convenience applications of the following roads: Texas, Oklahoma & Western R. R., 67 I. C. C. 484; Uvalde & Northern Ry. Co., 67 I. C. C. 554; Gulf Ports Terminal Ry. Co., 71 I. C. C. 759; San Antonio & Aransas Pass Ry. Co., 111 I. C. C. 483. It also passed an order on May 25, 1920, three months after the effective date of the act, in which it notified all carriers, contemplating or engaged in work of construction, to notify the Commission of the facts and circumstances, in order that it might determine whether the work had been actually undertaken as contemplated by paragraph 18, and whether a certificate of convenience and necessity would be required. It announced that if the projected extension or construction should have been actually undertaken in good faith within 90 days after the approval of the act, a certificate would not be required, but that the undertaking must embrace not merely a purpose or intent to extend and construct, but also the actual doing in good faith of acts calculated to complete and effect such purpose. It said that a mere provision in a charter or prospectus, or the making of a preliminary survey, would not in its opinion constitute an undertaking. The Piedmont & Northern made no response to this order.

We think it is clear upon the facts of this case that the Piedmont & Northern had not undertaken the extension of its lines now proposed within the time required by the Transportation Act. Neither it nor its promoters had been under any obligation to connect its lines of railroad at any time since the plan was first announced in 1910. Neither the corporation nor any one else in its behalf had authorized the construction of a single mile of track between April, 1914, and the passage of the stockholders' resolution on December 8, 1926. During an interval of nearly six years between March 1, 1921, and January 27, 1927, when its charter was amended, the corporation was without power to construct the South Carolina part of the extension between Spartanburg and Gastonia, since it had suffered this power to lapse, through failure to exercise it. The evidence does show beyond question that the project of a continuous line from Greenwood, on the south, to Durham or Winston-Salem, on the north, was conceived as early as 1910, and that parts of it were actually completed by the year 1914. But it does not follow that the plan was at any time undertaken as an entirety. It was hoped and believed that it would prove practicable to complete the the whole, and the idea was never abandoned; but the purpose so to do was still tentative and ambulatory, and, as it turned out, dependent for its consummation upon many considerations over which the corporation had little or no control. The Century Dictionary defines the word "undertake" as "to lay oneself under obligation to perform; to engage in; enter upon; take in hand; begin to perform; set about; attempt." We think that the term should be given this ordinary meaning in the paragraph under discussion, and, as thus defined, it is obvious that although the Piedmont & Northern had not only undertaken but completed its present lines of railway, it had not so much as undertaken the construction of the proposed lines before the authority conferred upon the Commission by paragraph 18 to regulate railroad building went into effect. To conceive and to intend to perform is not to undertake.

We come then to consider whether the Piedmont & Northern is an interurban electric railway not operated as part of a general steam railroad system of transportation. This inquiry may be speedily reduced to the single question whether the Piedmont & Northern is an interurban railway. It is obviously electric, and there can be little doubt that it is not operated as part of "a general steam railway system." The operation of the road, it is admitted, is entirely in the hands of the Piedmont & Northern Railway Company, independent of any other railroad corporation; and it is not a part of any other system of transportation, unless that

phrase is taken in a broad sense to mean the whole aggregation or network of railways of the United States which are physically connected for the interchange of business. In this sense the petitioner is a part of a railroad system, since, as will presently appear, it has physical connections and through traffic arrangements with steam roads which give it access to all parts of the country. In this sense the term "railway system" has been used in a number of cases by the Supreme Court, as for instance in Texas & Pac. Ry. v. Gulf, etc., Ry. Co., 270 U. S. 266, page 277, 46 S. Ct. 263, 266 (70 L. Ed. 578), where Mr. Justice Brandeis said: "By that measure [Transportation Act, 1920], Congress undertook to develop and maintain, for the people of the United States, an adequate railway system." See, also, Railroad Commission of Wisconsin v. C., B. & Q. R. Co., 257 U. S. 563, 589, 42 S. Ct. 232, 66 L. Ed. 371, 22 A. L. R. 1086; Dayton-Goose Creek Ry. Co. v. U. S., 263 U. S. 456, 478, 44 S. Ct. 169, 68 L. Ed. 388, 33 A. L. R. 472.

But, on the other hand, the term has also been used in a more restricted sense both by Congress and by the federal courts, and in this sense, something more than physical connections and through traffic arrangements must exist between railroads to constitute them parts of the same railway system. There must be also unity of ownership or unity of management and control. For example, the Federal Possession and Control Act of August 29, 1916, 39 Stat. 645 (10 USCA § 1361), empowered the President, through the Secretary of War, to take possession and control of any system or systems of transportation, and to utilize them for purposes connected with the emergency of the war. Again, the Federal Control Act of March 21, 1918, 40 Stat. 451, was entitled: "An act to provide for the operation of transportation systems while under federal control, for the just compensation of their owners, and for other purposes." This act was considered by the Supreme Court in Missouri Pacific R. Co. v. Ault, 256 U. S. 554, 557, 41 S. Ct. 593, 595 (65 L. Ed. 1087), where it was said: "By the establishment of the Railroad Administration and subsequent orders of the Director General, the carrier companies were completely separated from the control and management of their systems. * * *" Referring to section 10 of the act, which provided that carriers while under federal control should be subject to certain laws and liabilities, the court said (page 559 of 256 U. S. [41 S. Ct. 595]): "Here the term 'carriers' was used as it is understood

in common speech; meaning the transportation systems as distinguished from the corporations owning or operating them. Congress had in § 1 declared that such was its meaning. The President took over the physical properties, the transportation systems, and placed them under a single directing head; but he took them over as entities and they were always dealt with as such. * * * Each system was required to file its own tariffs. * * * Each was required to take an inventory of its materials and supplies. * * * Each federal treasurer was to deal with the finances of a single system. * * *" See also Hines v. Dahn (C. C. A.) 267 F. 105, 108, 109; Davis v. Donovan, 265 U. S. 257, 44 S. Ct. 513, 68 L. Ed. 1008; Davis v. Alexander, 269 U. S. 114, 46 S. Ct. 34, 70 L. Ed. 186.

The Transportation Act of 1920 was intended, amongst other purposes, to put an end to the federal control of railroads, and was entitled "An act to provide for the termination of federal control of railroads and systems of transportation," etc. Section 200, 41 Stat. 457, provided that federal control should terminate on March 1, 1920, and that the President should then relinquish possession of all railroads and systems of transportation under federal control. Section 407, 41 Stat. 480, amending section 5 of the Interstate Commerce Act (49 USCA § 5), provided in paragraph 4 that the Commission, as soon as practicable, should provide a plan for the consolidation of the railroad properties of the United States into a limited number of systems. The provisions of this and subsequent paragraphs of the section involve the idea of unity of ownership, control, and management over each of the several systems of transportation.

Section 422, 41 Stat. 488, adding section 15a to the Interstate Commerce Act (49 USCA § 15a), confers upon the Commission the power to prescribe just and reasonable rates for railroad carriers, and contains the so-called recapture provision by which the excess income of railroads is returned to the United States. Paragraph 6 provides that "the value of the railway property and the net railway operating income of a group of carriers, which the Commission finds are under common control and management and are operated as a single system, shall be computed for the system as a whole irrespective of the separate ownership and accounting returns of the various parts of such system." The Interstate Commerce Commission applied this section in excess income of St. Louis & O'Fallon Ry. Co., 124 I. C. C. 3, 11, and held

that, in the absence of any contrary indication, it must be assumed that Congress had in mind the usual meaning of the word "system" as applied to railroads, implying an operating relationship and unity and involving (1) common control, (2) common management, and (3) operation as a system. A similar construction was given by the Commission to the same term in paragraph 22 of section 1 of the act now under consideration in the cases of the Michigan United Rys. Co., 67 I. C. C. 452, and Sacramento Northern Ry. Co., 71 I. C. C. 653. These rulings in our opinion were correct. They are borne out by the phraseology of the excepting clause in section 15a, wherein Congress excluded from the authority of the Commission "interurban electric railways, * * * unless operated as a part of a general steam railroad system of transportation or engaged in the general transportation of freight." If the broad significance for which petitioner contends should be given to the first clause in this alternative, there would be no need for the second, for it is a matter of common knowledge that physical connections are established between the two kinds of railway to enable the interurban to engage in the general transportation of freight.

It is contended that the presence of the word "general," in the phrase "general steam system of transportation," requires that the broader of the two meanings we have discussed should be applied. But the word "general" may be given proper weight if it is referred to the kind of transportation, excluding railroads engaged in a special or local service, and indicating those engaged in general transportation. We conclude that the Piedmont & Northern is not a part of a general steam system of transportation, within the meaning of paragraph 22, § 1.

But the petitioner must also show, in order to escape the Commission's control, that it is an interurban railroad, a matter which can only be determined by a consideration of the character of its construction and equipment and the business which it conducts. The petitioner says that the distinguishing feature of an interurban road is a certain type of local service which is rendered by no other class of carrier; and so long as a road retains this feature, it remains an interurban, no matter how much it may resemble steam lines in the scope and character of its other activities. Let us then first consider the local passenger and freight service of the Piedmont & Northern which it renders on its present lines, and would also expect to give in greater measure should they be doubled in length by the proposed extensions. In the testimony before the Commission, this service was compared with the local service of the Southern Railway, a parallel steam railroad admittedly of the first class.

The existing lines of the Piedmont & Northern have connections with the street railway systems of the cities which it serves, acquired either by direct ownership or by contracts for trackage rights. Thereby its passenger cars within the cities en route become street railway facilities. Between the cities there are frequent stops for passengers at an average distance of 1.2 miles apart—that is to say, 106 stops in 128 miles of road. 49 passenger trains daily traverse various parts of the line. There are more daily trains and more frequent stops than on the corresponding mileage of the Southern Railway. Furthermore, the spacing between the trains is more uniform. The passenger cars are motivated by self-contained motor units, and are lighted from a trolley. By reason of their equipment, they are not unacceptable upon steam lines.

The use of city streets for the collection and delivery of freight is a peculiar characteristic of the Piedmont & Northern and other interurban roads. Its electric locomotives and cars are constructed to take the sharp curves and steep grades peculiar to the city streets but not found upon steam railways. It is even possible for electric locomotives to go inside a building where a steam locomotive cannot go. The switching service thus made available in the cities is extremely convenient for industries of all sorts, including factories, wholesale houses, and even retail houses. The street railway lines are used largely for delivery and pick up service; but the bulk of the through traffic does not move over the city streets.

Local freight service between cities on the petitioner's lines is also more flexible and convenient than that rendered by the steam railways. There are more daily freight trains in small units. 18 trains, which average 14 loaded and 6 empty cars, are operated daily. There are more frequent stops on the Piedmont & Northern than on the Southern in local station to station movement of freight. In addition, there are local switches for industrial plants so that freight is delivered and picked up all over the line. In the delivery of less than carload freight in short distances up to 60 miles, there is more expedition and greater dispatch than in the handling of similar business on the Southern. The electric locomotives for the movement of freight are of somewhat lighter character

than those employed on the steam roads and are unfit for long-haul heavy-load traffic such as that hauled by the electric locomotives on the Virginian railway. The cars and locomotives are so equipped that they can be used either upon a voltage of 1,500 d. c. between the cities or 600 d. c. inside the cities.

It is of course true that in a measure steam railroads render the same sort of local freight service as the Piedmont & Northern Railway. Thus the evidence shows that the Southern Railway, as well as the other steam railroads, runs daily local freight trains in a station to station movement, and serves mills and factories en route by numerous industrial sidings or switches. At many points on steam roads, in or near cities, there are curves as sharp as any on the Piedmont & Northern, smaller engines of a special type being used in some instances to render the necessary switching service. The difference between the local freight service of the Piedmont & Northern and that of the steam railroads consists chiefly in the use of the street railway systems to gather up and deliver freight in the cities, the greater number of local freight stations on its lines between cities, the operation of its freight trains in smaller units and with greater frequency, and of a speedier delivery of local freight between nearby points.

The local passenger and local freight business thus described give to the road the peculiar features upon which the petitioner relies to distinguish it from the ordinary steam railroad. But this business constitutes only a small part of the petitioner's operations. Far greater is its general freight business, made possible by interchange relations with steam trunk lines in the south through which it is connected for the receipt and delivery of property with vast sections of the United States. Upon this phase of its activities, the Commission, in its opinion, and the opponents of the petitioner in this case, depend to show that the road is not merely an interurban electric railway, but something far more important in the business of transportation. In the nature of things its extra-interurban operations consist of freight movements. This is so because the great bulk of its passenger traffic is local and is carried in cars which cannot be used on steam roads; while its freight cars can be and are freely interchanged with connecting steam railroads.

The roadbed, rolling stock, and equipment are of such a character that it is well suited to co-operate with steam railroads in the transmission of freight to distant points. Freight trains of 45 cars, using 2 locomotives, are not unusual; the average train is 20 cars. Most of the freight traffic is handled in cars owned by steam railroads, but the petitioner owns 165 automobile cars and 99 other box cars, all of which are of ordinary steam railway type and move freely on foreign roads. Altogether, there are 337 cars. The construction is that of a standard steam railway. Expensive grading was undertaken, and grades and curves are suitable for heavy traffic. Rails are of 80-pound section. Bridges were made as strong as those on the Southern Railway, and the locomotives purchased were heavier than was necessary for merely local traffic. The purpose of the builders from the beginning was to construct a line of railroad which would aid in the industrial development of the Piedmont region and serve as a means by which mills and factories could find connections with the steam railroads of the country for the delivery of freight. Points of contact with carriers extending to outside territory have been obtained in as large a number as possible.[1] Traffic agreements have been made with the Seaboard Air Line, the Southern Railway, and other roads with reference to rates and the division of revenue received in the interchange of traffic. While street railways have been used for local deliveries, the through freight does not pass through the cities, but is carried over additional lines which run around the cities and avoid the city streets.

The business methods of the road are similar in many respects to those of steam railroads. It is a party to the tariffs of the steam roads and to the uniform express contract of the American Railway Express Company. It is a member of the American Railway Association, the Southern Freight Association, and other traffic organizations of the steam roads. It is represented by powers of attorney in nearly every tariff bureau of the United States and has 502 published tariffs. It follows the methods of steam roads in matters of rate divisions, interline billing, claim

---

[1] The Piedmont & Northern has the following points of interchange on through routes in addition to switching points with steam railroads:

| Points of Interchange. | Connections. |
| --- | --- |
| Charlotte, N. C. | Southern Railway. |
| Pinoca, N. C. | Seaboard Air Line Railway. |
| Gastonia, N. C. | Southern; C. & W. C. Ry. |
| Greenwood, S. C. | Seaboard Air Line Ry. |
| Shoals Junction, S. C. | Ware Shoals R. R. |
| Anderson, S. C. | Blue Ridge R. R. and C. & W. C. Ry. |
| Greenville, S. C. | Southern; C. & W. C. Ry.; G. & N. Ry. |
| Spartanburg, S. C. | Southern; C. & W. C. Ry., Clinchfield. |

settlements, and in all of its relations with shippers and consignees. It publishes a tariff directory which is on file with the Interstate Commerce Commission. It has a general agent in New York, a commercial agent at Atlanta, and at all of its connecting points.

The entire territory east of the Mississippi is tributary to the road, in that freight originating on and destined to it is derived from or moves to every part of that section of the United States. While the matter had not been studied in detail, the evidence tended to show that the road also sends freight beyond the Mississippi to the Pacific Coast and to New England.

The distribution of operating revenues very clearly tells the story. Petitioner's witnesses, speaking in round figures, state that 92 per cent. of the revenue is derived from freight and only 8 per cent. from passenger traffic. The detailed figures for 1926 show even a greater disparity.[2]

The contrast between the revenues from local business and that from business interchanged with steam roads in 1926 is equally striking. While 97.63 per cent. of the passenger revenue was derived from local traffic, and only 2.37 per cent. from interchange, the reverse is true with revenues from freight of which only 4.75 per cent. came from local station to station movement and 95.25 per cent. from traffic handled jointly with steam roads. Of 72,886 loaded cars handled, 68,370 were interchanged, most of them in interstate movement, reaching all parts of the United States.

The proposed extensions would not alter the character of the petitioner's business. There would be the same local service in the transportation of passengers and freight, since the railway would connect with street railways of the cities en route. At the same time the interchange of freight business with steam railroads would be greatly increased. Indeed, if the road should be completed so as to form a continuous interstate line in North and South Carolina, it would constitute the interior connecting link in a new joint through route, and in effect a new trunk line will be formed in addition to those now provided by the systems of the Southern, the Seaboard, and the Atlantic Coast Line; for the Piedmont & Northern would then connect with the Georgia & Florida at Greenwood, S. C., on the south, and with the Norfolk & Western at Winston-Salem, N. C., on the north. Numerous new connections with steam roads would then be made, and many new points in distant sections of the country would become accessible; and the railway would become to an increased extent an integral part of the great interstate railway system of the country.

The amount and character of the new business which would be done in the first year of the construction of the extensions has been estimated by officials of the petitioner as follows:

| | |
|---|---:|
| Freight | $3,597,384 00 |
| Passenger | 196,502 15 |
| Express | 70,260 76 |
| Miscellaneous | 25,869 66 |
| | $3,890,016 57 |

During the succeeding five years, an increase each year of 8.4 per cent. over the preceding year would be expected.

It will be observed that the existing predominance of freight over passenger revenues would continue. It is estimated that the freight traffic would have its origin in the following manner:

Local traffic having origin and destination on the railway's lines, 21 per cent.

Traffic originating beyond and destined to the railway, 44 per cent.

Traffic originating on the railway and destined to points beyond, 20 per cent.

Overhead or bridge traffic, 15 per cent.

The proportion of bridge traffic estimated shows that it would be still of minor importance as compared with the traffic which originates on or is destined to points on the railway. The opposite is true of the Southern Railway in the Piedmont district.[3]

---

[2] Operating revenues of the P. & N. for the year 1926.

| Freight: | Per cent. | |
|---|---:|---:|
| Local station to station | 4.75 | $ 108,572 05 |
| Freight interchanged with connecting lines | 93.12 | 2,130,843 80 |
| Overhead or bridge traffic | 2.13 | 48,676 13 |
| | | $2,288,091 98 |
| Passenger: | | |
| Local station to station | 97.63 | $ 135,258 97 |
| Passengers exchanged with connecting lines | 2.37 | 3,280 71 |
| Total passenger | | $ 138,539 68 |
| Total freight | 90.90 | $2,288,091 98 |
| Total passenger | 5.50 | 138,539 68 |
| Express revenue | | 39,440 00 |
| Mail | 3.60 | 897 00 |
| Other sources | | 30,393 00 |
| Total revenues | | $2,517,361 66 |

[3] The report of the Commission contains the following: "The estimated cost of construction is $6,684,377, for the Charlotte-Winston-Salem line, and $4,954,088 for the Gastonia-Spartanburg line, a total cost, without equipment, of $11,638,465. It is expected that 18 new 60-ton locomotives, costing $75,000 each, will be required for freight service for the first year, and five more locomotives of the same type for the fifth year. The applicant represents that

Much testimony was offered to show that the expected increase in revenue would be accomplished at the expense of the Southern and other intervening railroads, particularly since it is natural to suppose that the influence of the interests associated with the great fortune left by the late J. B. Duke would be exerted in the petitioner's behalf. This consideration is not material to the decision of the question before the court, except in so far as it constitutes another circumstance tending to prove that the new business of the petitioner would not be of a local character but would be derived in great measure from the carriage of long-distance freight, handled in competition with steam railroads.

The conclusion of fact to be drawn from this recital of the business of the railway was set forth with substantial accuracy in 1920 by the president of the corporation, in a statement to the Interstate Commerce Commission. He was seeking to secure for his road the same increase of intrastate rates and fares as had been allowed the steam railroads in South Carolina, under section 15a of the Interstate Commerce Act. To support his plea, he said: "The Piedmont and Northern Railway is an electrically operated railroad in that it employs electric locomotives instead of steam locomotives and that is the only distinction between it and the steam roads." He further showed that the railway was an interstate carrier in the fullest sense of the word in competition with the steam trunk lines of the South for both intrastate and interstate business. Testimony to the same effect was given in the case at bar by the railway's traffic manager. He stated that the railway is a distinctly interurban railroad-plus, and that it performs all the characteristic services of an interurban railroad and equals that of standard railroads in other respects. This may be taken as an accurate summary of the situation, if there be added the admitted fact that the service which it renders in similitude to that of standard railroads constitutes by far the greater part of its activity.

The Interstate Commerce Commission found that except for the relatively unim-

the passenger and freight cars which it now owns are ample to provide for its present needs, but that 10 additional passenger cars and probably 200 freight cars of the present type may be required after five years. The applicant will continue to depend on the steam roads for freight cars. The figures presented in these estimates show clearly the minor importance of passenger traffic, or of any ordinary interurban movement."

portant passenger traffic, the functions of the railway's line and its methods of operation do not differ materially from those of a steam road in any essential particular, except in the use of electric power. It therefore held that the railway, as proposed to be extended, would be "a commercial railroad operated by electricity and not an electric interurban line within the meaning of Paragraph 22 of section 1." It remains only to be determined whether this conclusion of law is justified upon the facts which we have outlined.

The argument advanced by the petitioner to meet the situation created by the dual nature of its activities may be summarized as follows: Since the Piedmont & Northern performs the characteristic service, it is entitled to the designation of an interurban railroad, and hence comes within the exception of paragraph 22 of section 1, no matter what else it may do in the field of transportation. Congress, in dealing with interstate commerce, has always drawn a line of demarcation between matters of national import and those primarily of local concern, and has left the latter to state legislation and control so far as it was consistent with the interests of the nation. See Illinois Central R. Co. v. Public Util. Com., 245 U. S. 493, 510, 38 S. Ct. 170, 62 L. Ed. 425. The people of the United States are principally dependent upon interstate carriers owning and operating general steam railroad systems of transportation and lines operated under their control. But the service of independent interurban electric railways is primarily a local service, and they usually touch the main channel of interstate commerce merely as feeders to steam railroad systems. Therefore whilst constantly enlarging the authority of the Commission over steam carriers, Congress has felt that the local interest is paramount in matters affecting the development of interurban railways and has left them to the regulation of State Utility Commissions. Thus divers provisions are found in the acts of Congress pertaining to interstate carriers expressly excluding interurban railways from the control of the Commission, and in these statutes the term "interurban" has been used in the same sense as in the opinions of the Commission and the courts, to indicate not only electric railways of small mileage, confined chiefly to local business, but also to describe roads of even greater extent than the Piedmont & Northern.

This discussion necessarily involves a consideration of the acts of Congress which relate to electric railways—particularly the Transportation Act of 1920, whereby para-

graphs 18 to 22 of section 1 of the Interstate Commerce Act were enacted. The general purpose of the Transportation Act, and of the paragraphs in question, was made clear by the Supreme Court in Texas & Pacific Ry. Co. v. Gulf, etc., Ry. Co., 270 U. S. 266, 46 S. Ct. 263, 70 L. Ed. 578. The court was called upon to decide whether certain new trackage proposed by a carrier would constitute an extension of its line into new territory, requiring a certificate of public convenience and necessity under paragraph 18, or, as the carrier claimed, a spur or industrial track covered by the exception in paragraph 22. In support of its contention, the carrier cited certain instructions issued by the Commission differentiating branches from spurs, and pointed to uses made of these terms by courts, by the Commission, and by state Legislatures. The Supreme Court said (page 277 of 270 U. S. [46 S. Ct. 266]):

"A truer guide to the meaning of the terms extension and industrial track, as used in Paragraphs 18 to 22, is furnished by the context and by the relation of the specific provisions here in question to the railroad policy introduced by Transportation Act, 1920. By that measure, Congress undertook to develop and maintain, for the people of the United States, an adequate railway system. It recognized that preservation of the earning capacity, and conservation of the financial resources, of individual carriers is a matter of national concern; that the property employed must be permitted to earn a reasonable return; that the building of unnecessary lines involves a waste of resources and that the burden of this waste may fall upon the public; that competition between carriers may result in harm to the public as well as in benefit; and that when a railroad inflicts injury upon its rival, it may be the public which ultimately bears the loss. See R. R. Com. v. C., B. & Q. R. R. Co., 257 U. S. 563 [42 S. Ct. 232, 66 L. Ed. 371, 22 A. L. R. 1086]; The New England Divisions Case, 261 U. S. 184 [43 S. Ct. 270, 67 L. Ed. 605]; The Chicago Junction Case, 264 U. S. 258 [44 S. Ct. 317, 68 L. Ed. 667]; R. R. Com. v. Southern Pacific Co., 264 U. S. 331 [44 S. Ct. 376, 68 L. Ed. 713]. The Act sought, among other things, to avert such losses.

"When the clauses in Paragraphs 18 to 22 are read in the light of this congressional policy, the meaning and scope of the terms extension and industrial track become clear. The carrier was authorized by Congress to construct, without authority from the Commission, 'spur, industrial, team, switching or side tracks * * * to be located wholly within one State.' Tracks of that character are commonly constructed either to improve the facilities required by shippers already served by the carrier or to supply the facilities to others, who being within the same territory and similarly situated are entitled to like service from the carrier. The question whether the construction should be allowed or compelled depends largely upon local conditions which the state regulating body is peculiarly fitted to appreciate. Moreover, the expenditure involved is ordinarily small. But where the proposed trackage extends into territory not theretofore served by the carrier, and particularly where it extends into territory already served by another carrier, its purpose and effect are, under the new policy of Congress, of national concern. For invasion through new construction of territory adequately served by another carrier, like the establishment of excessively low rates in order to secure traffic enjoyed by another, may be inimical to the national interest. If the purpose and effect of the new trackage is to extend substantially the line of a carrier into new territory, the proposed trackage constitutes an extension of the railroad within the meaning of Paragraph 18, although the line be short and although the character of the service contemplated be that commonly rendered to industries by means of spurs or industrial tracks. Being an extension, it cannot be built unless the federal commission issues its certificate that public necessity and convenience require its construction. The Hale-Cement Line is clearly an extension within this rule."

Now it is obvious that the purpose of the law will be defeated by too liberal an interpretation of the term "interurban electric railway." It could not be given the broadest of all meanings, for it would then comprehend any railway using electric power which runs between cities, without regard to the character or extent of its business. The electrification of steam roads in 1920 had already progressed to a considerable extent, and it cannot be supposed that it was the intent of Congress to except all railroads which should adopt electric motive power from the control of the Commission over new constructions and extensions. On the contrary, it is an elementary rule that exceptions from the general policy embodied in a statute are to be strictly construed and are not to be so interpreted as to destroy its remedial purpose. Spokane & Inland R. Co. v. U. S., 241 U. S. 344, 350, 36 S. Ct. 668, 60 L. Ed. 1037. Admitting the general rule, the petitioner never-

theless says that the total amount of business done by interurban electric railways is relatively small; and that, when the terms of the several statutes dealing with them are fairly considered, it is impossible to escape the conclusion that Congress intended to exclude such a railroad as the Piedmont & Northern from the purview of the statutory provisions now under consideration. The desirability of leaving the management of local concerns to the regulation of state authorities outweighed any danger to the transportation system of the country.

The history of the acts of Congress which have dealt with electric railways is disclosed in the decisions of the Supreme Court in Omaha & C. B. Street Ry. Co. v. I. C. C., 230 U. S. 324, 33 S. Ct. 890, 57 L. Ed. 1501, 46 L. R. A. (N. S.) 385, and U. S. v. Village of Hubbard, 266 U. S. 474, 45 S. Ct. 160, 69 L. Ed. 389.

In the first case it was held that although the original Interstate Commerce Act of February 4, 1887, 24 Stat. 379, applied in terms to all carriers engaged in the transportation of passengers or property by railroad, nevertheless street railways for passengers only, as they existed in 1887, although engaged in the carriage of passengers across state lines, were not within the contemplation of Congress and were not subjected to the jurisdiction of the Interstate Commerce Commission. Referring to interurban railways, the court said at page 337 of 230 U. S. (33 S. Ct. 892): "But it is said that since 1887, when the act was passed, a new type of interurban railroad has been developed which, with electricity as a motive power, uses larger cars and runs through the country from town to town, enabling the carrier to haul passengers, freight, express and the mail for long distances at high speed. We are not dealing with such a case, but with a company chartered as a street railroad, doing a street railroad business and hauling no freight."

In the Village of Hubbard Case, it was decided that by reason of the generality of the language of the original act, which declared in section 1 that its provisions should apply to any common carrier engaged in the transportation of passengers or property by railroad, the Interstate Commerce Commission was given jurisdiction over interurban electric railways engaged in interstate commerce so as to require an increase of intrastate railway fares which subject interstate commerce to unjust discrimination. It was shown that the development of interurban roads became general about 1902, and that the authority to regulate them has been con-

sistently exercised by the Commission for many purposes, although no specific reference to electric railroads was made prior to the amendment of the Act of June 18, 1910, 36 Stat. 539. The practice of the Commission in making no distinction between railroads operated by steam and those operated by electricity was approved.

Congress has been careful, however, in various enactments, to distinguish between general steam railroads and interurban electric railroads, and also between members of the latter class with reference to the character of business done. In a number of instances, electric railroads have been excluded from the benefits provided or the authority conferred upon the Commission by the statutes.[4] It is apparent from these enact-

---

[4] The Act of June 18, 1910, ch. 309, 36 Stat. 539, 551, 552, provided that "the Commission shall not * * * establish any through route, classification, or rate between street electric passenger railways not engaged in * * * transporting freight in addition to their passenger and express business and railroads of a different character." This provision, with immaterial amendments, was re-enacted as section 15, par. 3, of the Transportation Act of 1920, 41 Stat. 485. The Federal Control Act of March 21, 1918, 40 Stat. 451, provided for the administration of the transportation systems taken over by the President during the emergency of the war under the Act of August 29, 1916, 39 Stat. 645. Section 1, 40 Stat. 453, declared that certain carriers should be considered as within federal control, provided that nothing therein should be construed "as including any street or interurban electric railway which has as its principal source of operating revenue, urban, suburban, or interurban passenger traffic, or sale of power, heat and light, or both." The Transportation Act of February 28, 1920, 41 Stat. 456, in addition to section 15 (3), supra, excludes interurban electric railways in other sections. Section 402, 41 Stat. 478, amending section 1, which provides for the issuance of certificates of public convenience and necessity in the case of construction, extension, or abandonment of a line, excludes by paragraph 22, 41 Stat. 478, "street, suburban, [and] or interurban electric railways, which are not operated as a part or parts of a general steam railroad system of transportation." Section 439, 41 Stat. 494, which inserts the new section 20a (49 USCA § 20a) concerning the issuance of securities, excludes by paragraph 1 "a street, suburban, or interurban electric railway which is not operated as a part of a general steam railroad system of transportation." Section 300, 41 Stat. 469 (45 USCA § 131), which deals with the Railway Labor Board, created to adjust disputes between carriers and their employés, excludes by paragraph 1 "a street, interurban, or suburban electric railway not operating as a part of a general steam railroad system of transportation." Section 204, 41 Stat. 460 (49 USCA § 73), which relates to reimbursement of deficits of carriers during federal control, by paragraph (a) ex-

ments that the carrier described by Congress as an interurban electric railway is one which may have one or more of the following characteristics: (1) It may be operated as part of a general steam railroad system of transportation. (2) It may have as its principal source of operating revenue, passenger traffic or sale of power, heat, and light. (3) It may have as its principal source of operating revenue, freight traffic. (4) It may be engaged in the general transportation of freight. (5) It may make through traffic arrangements with steam railroads and thereby increase its freight business.

Moreover, it is clear that engagement by an interurban electric railway in the general transportation of freight does not of itself bring the carrier within the jurisdiction of the Commission over the construction and extension of railroad lines. No other conclusion can fairly be drawn from the fact that an interurban electric railway, engaged in the general transportation of freight, is expressly kept within the rate-making power given to the Commission by section 15a, but such a carrier is not mentioned at all in the exception set out in paragraph 22 of section 1. Hence the petitioner, bearing in mind that the Piedmont & Northern performs the service of an interurban electric railway and engages in the general transportation of freight, contends that the railroad is within the exception of paragraph 22 and is at liberty to extend its lines without the Commission's consent. But these considerations do not necessarily lead to the conclusion sought to be reached. It is true that an interurban carrier may be entitled to that descriptive name although it participates in general freight traffic; but it does not follow that

cluded "any street or interurban electric railway which has as its principal source of operating revenue, urban, suburban, or interurban passenger traffic .or sale of power, heat, and light, or both." Section 209, 41 Stat. 464 (49 USCA § 77), concerning the guaranty to carriers after the termination of federal control, excludes by paragraph (a) "a street or interurban electric railway not under federal control at the time federal control terminates, which has as its principal source of operating revenue, urban, suburban, or interurban passenger traffic, or sale of power, heat, and light, or both." Section 422, 41 Stat. 488, which introduced the new section 15a (49 USCA § 15a), dealing with the determination of a fair return on property value, excludes in paragraph (1) (b) "street or suburban electric railways unless operated as a part of a general steam railroad system of transportation, (c) interurban electric railways unless operated as a part of a general steam railroad system of transportation or engaged in the general transportation of freight."

every electric carrier, so engaged, is an interurban railroad. Freight traffic may be limited in extent and within the scope of a carrier devoted primarily to local business, and at the same time be general in its nature. The carrier may transport the kinds of property usually carried by steam roads in addition to the carriage of baggage, mail, and express, and yet be so restricted in its operations that it may not be properly classified with general steam carriers whose operations cover a wide field. See the discussion in Lackawanna & Wyoming Valley Ry., 105 I. C. C. 178.

The difference in language between the exception in section 15a and the exception in section 1, par. 22, may not be ignored, but it is accounted for by the fact that in one case Congress was dealing with rates, and in the other, with the construction of new lines. It evidently concluded that if an electric interurban road should build up a business of transporting property to such an extent as to be engaged in the general transportation of freight, it should be included in the general rate adjustment provided in section 15a with a view to uniformity of rates and the connection of the carrier with steam railroads. On the other hand, Congress was of the opinion that so long as an electric carrier should remain independent of steam railroads in its operation and control, and should be engaged in the local carriage of passengers and freight, as its primary business, the extension of its line would remain a matter of local concern and should be left to the regulation of local authority. It is obviously difficult to form an exact definition of the term under discussion and to say when the general freight business of an electric railway has become so great that it has crossed the line between an interurban railroad, engaged in the general transportation of freight, and a general carrier subject to the provisions of the statute. But there is no difficulty in the case at bar in determining that the Piedmont & Northern has ceased to be primarily an interurban railroad. If any line of demarcation is to be drawn, there can be no doubt that a railroad, 92 per cent. of whose traffic comes from the general transportation of freight, and 95 per cent. of whose freight traffic is interchanged with carriers connecting it with all parts of the United States, is to be placed in the same category as a general steam railroad.

It is going too far to say that the Piedmont & Northern is outside the jurisdiction of the Commission over extensions, because,

literally speaking, it is an interurban electric railway. It is well settled that the literal meaning of the terms of a statute do not necessarily control. The Supreme Court has applied the rule in the interpretation of the term "carriers" in Omaha Street Railway Co. v. I. C. C., supra, and again in construing the term "industrial track and extensions" in Texas & Pacific Ry. v. Gulf, etc., Ry. Co., supra; and in each instance, has held that the literal significance of the words must give way to the general purpose of the enactment. The decision in Spokane & Inland R. Co. v. U. S., supra, is particularly pertinent in view of the fact that by far the most important activity of the Piedmont & Northern is its general freight business which it carries on precisely like an interstate steam railroad, and that this business has little relation to the local interurban service which it renders. The United States brought suit in that case against the carrier for violation of the Safety Appliance Act, in failing to equip cars with certain appliances required by the statute. The dereliction was admitted; but it was contended that no offense had been committed because the act did not apply to a street railway and the cars of the carrier on their regular route traversed a line of street railway. The court held that the exception in the act did not apply because the cars were also used in regular interstate traffic; for otherwise, the plain purpose of the law would be defeated. A similar result would follow in the case at bar if the transportation of relatively insignificant interurban business by the Piedmont & Northern should deprive the Commission of power to control the railway in the greater field of its operations in which it competes with general railroad systems. See also Railroad Comm. of Cal. v. Southern Pac. Co., 264 U. S. 331, 44 S. Ct. 376, 68 L. Ed. 713

The petitioner cites opinions of the Interstate Commerce Commission and the United States Railroad Labor Board in which electric roads, engaged in the transportation of freight, some of them having a much greater mileage than the Piedmont & Northern, have been described as interurban.[5]

[5] Chicago & Milwaukee Elec. R. Co. v. Illinois Cent. R. Co., 13 I. C. C. 20; Cedar Rapids' & Iowa C. R. & Light Co. v. Chicago & N. W. R. Co., 13 I. C. C. 250; Cincinnati & Columbus Traction Co. v. B. & O. Southwestern R. R. Co., 20 I. C. C. 486; St. Louis, Springfield & Peoria R. R. v. P. & P. U. Ry. Co., 26 I. C. C. 226; Louisville Board of Trade v. Indianapolis, Columbus & Southern Traction Co., 27 I. C. C. 499; Jurisdiction over Urban Electric Lines, 33 I. C. C. 536; Chicago, Ottawa & Peoria Ry. Co.

Most of these cases involved applications for through routes and joint rates with steam roads. The extent to which the electric carrier was engaged in the general transportation of freight was discussed, since electric street railways, not so engaged, are outside the purview of the act. But the Commission was not called upon to draw the line between an interurban and a steam railroad. The decision of the Labor Board, however, was directly in point, for the exception of certain interurban electric railways from its control by section 300 of the Transportation Act is in the same terms as the exception in paragraph 22 of section 1. The Board held that the Piedmont & Northern and other carriers were excluded from its jurisdiction upon the same grounds as are urged by the petitioner in this case to support its argument.

During the war, the Railroad Administration of the United States was called on to decide what carriers should be taken over by the government. It was required under the

v. Chicago & Northwestern Ry. Co., 33 I. C. C. 573; St. Louis, Mo.-Illinois Passenger Fares, 41 I. C. C. 584; Lourie Mfg. Co. v. Cincinnati Northern R. R. Co., 42 I. C. C. 448; U. S. Railroad Labor Board, Decision No. 33, December 11, 1920.

The Illinois Traction System is described (St. Louis, S. & P. R. Co. v. P. & P. U. Ry. Co., 26 I. C. C. 226; St. Louis, Mo.-Illinois Passenger Fares, 41 I. C. C. 584; Lourie Mfg. Co. v. Cincinnati Northern R. Co., 42 I. C. C. 448), as an aggregation of railroads which operates about 425 miles of standard-gauge electric lines in Illinois and owns some 900 cars, of which 775 are freight cars. The system has through routes and joint rates with steam roads to the west, northwest, and southwest; in 1915 its gross freight revenue was about $400,000. The decision of the Labor Board refers to "the Pacific Electric Railway Company, operating upward of 600 miles of road; the Fort Dodge, Des Moines and Southern R. R., owning 2400 box and coal cars, and the Spokane & Inland Empire R. R., crossing State lines and operating passenger and freight trains."

The Memorandum Concerning Electric Railway Companies Reporting to the Interstate Commerce Commission for the Year 1917, issued by the Bureau of Statistics of the Commission May 12, 1919, referred to in United States v. Village of Hubbard, 266 U. S., 474, 478, note 4 [45 S. Ct. 160, 69 L. Ed. 389], and discussed in the petitioner's brief, gives the mileage operated and the distribution of operating revenues for 267 roads. With the exception of certain railroads devoted to special service, such as terminal and belt line railroads, there were few of any importance in 1917 whose freight revenues formed so large a part of the whole as did those of the Piedmont & Northern. The reports do not show how much of the revenues were derived from interstate or interchange business.

provisions of the Federal Control Act to exclude all interurban electric railways, the major part of whose revenues were drawn from passenger traffic, or the sale of power, heat, and light, or both. The question was solved by rejecting all electric railways whose revenues answered the description in the exception, without regard to the extent of their participation in freight traffic. Certain electric carriers, engaged in the transportation of freight, complained of this classification because it disabled them to raise their intrastate rates in the same manner as was done by other railroads under federal authority. (See Hearings before House Committee on H. R. 4378 [the bill which finally became Transportation Act of 1920], volume 2, pp. 1880, 1947). The complainants said that although their passenger business exceeded their freight business, nevertheless their locomotives, cars, and connections for interchange of business were such that they were able to transport freight in precisely the same manner as steam roads. They contended that it was not proper to classify them as interurban railroads. The adverse decision of the Railroad Administration prior to the passage of the Transportation Act is pertinent to this discussion. But it does not constitute a course of administrative conduct so long continued, and so well settled, that we must shut our eyes to the broad purpose of the act and assume that the legislative branch of the government in 1920 used the word "interurban" as defined by the executive during the period of the war. New York, New Haven & H. R. Co. v. Interstate Commerce Commission, 200 U. S. 361, 401, 26 S. Ct. 272, 50 L. Ed. 515.

The construction placed by the Interstate Commerce Commission upon the language contained in the exception in paragraph 22 of section 1, and in section 20a of the act, has not been uniform. On October 12, 1920, the Commission ruled that it did not have jurisdiction over the Piedmont & Northern in regard to the issuance of securities because the road was covered by the exception in section 20a. This ruling, however, was ex parte, and no opinion seems to have been filed. The Application of Michigan United Railways Co., 67 I. C. C. 452, for a certificate of public convenience and necessity, was considered on April 21, 1921. The railroad serves cities in Michigan and adjacent territory and has a physical connection for interchange of business with the Pere Marquette Railway. The Commission's memorandum of 1917 shows that it is 404.16

miles in length, and that its passenger revenues were $3,402,002.27, and freight revenues, $392,633.58, in that year. It was decided that the railroad was covered by the exception in paragraph 22 of section 1 of the act.

On the other hand, the Commission decided in 1922 that it had jurisdiction under section 20a over the Sacramento Northern Ry. Co., 71 I. C. C. 653, and Id., 79 I. C. C. 782. This company owned and operated an electric railway extending 165 miles northerly from Sacramento, which was equipped with locomotives capable of hauling from 40 to 50 loaded freight cars. The most important part of its business was through passenger and freight traffic, originating on its lines and delivered to steam trunk lines for interstate transportation. The Commission, answering the contention that the road was excluded from its authority as an interurban railroad, said: "We are by no means convinced, however, that the Northern is an interurban electric railway as that term is used in the statute. Much of the transportation service rendered by it, no doubt, is similar to that rendered by electric interurban railways. The service of such railways, however, is distinguished by its local and limited character and by the fact that the bulk of their revenues are derived from the transportation of passengers.[6] Their facilities for handling freight are usually inadequate or lacking so as to disable them from engaging in its general transportation. The amount of business interchanged by them with connecting carriers is ordinarily very small. Congress obviously did not intend to exclude all electric railways from the operation of Section 20a. If the Western Pacific were to completely electrify its system it would not thereby become a 'street, suburban, or interurban electric railway.' Some of its operations might partake of the nature of street, suburban, or interurban railway service, but its business as a whole would be of a far broader character. Simi-

[6] The statement that the service of an interurban railroad is distinguished by its local and limited character is not disputed. It is borne out by the opinions of the Commission, of the Labor Board, and by statements and testimony offered to the Congressional Committee when the Transportation Act of 1920 was under consideration. See the statement of the American Electric Railway Association, and of the National Association of Railroad and Utilities Commissioners, in Hearings before House Committee on Interstate and Foreign Commerce, H. R. 4378, volume 3, p. 2418; volume 2, pp. 1611, 1613, 1629.

436

larly it appears from the facts of record that the Sacramento Northern is more than an interurban carrier as that term is generally understood." See, also, Ex parte No. 38, 122 I. C. C. 414.

It is our conclusion that the more recent rulings of the Commission conform to the purpose of the statute and point the way to the correct classification of the Piedmont & Northern. Its freight traffic dominates so completely the field of its operations, and reaches so far, through interchange with other railroads, that it is outside the class which Congress intended to exclude from the control of the Commission. Even if in the beginning it was merely an interurban railroad, its essential character has so greatly changed, and its operations and interests have become so similar to those of a general steam carrier, that it is now well able to commit the mischiefs of uncontrolled expansion, which the act was designed to prevent.

The petition must therefore be dismissed.