### INTERSTATE COMMERCE COMMISSION et al. v. PIEDMONT & N. RY. CO.
### No. 253.

District Court, W. D. South Carolina.
May 23, 1931.

Daniel W. Knowlton and Nelson Thomas, both of Washington, D. C., for Interstate Commerce Commission.

W. S. O'B. Robinson, Jr., and R. S. Hutchison, both of Charlotte, N. C., and H. J. Haynsworth, of Greenville, S. C., for Piedmont & N. Ry. Co.

L. E. Jeffries and S. S. Alderman, both of Washington, D. C., and Blythe & Bonham, of Greenville, S. C., for Southern Ry. Co. and others.

Carl H. Davis and F. B. Grier, both of Wilmington, N. C., for Charleston & W. C. Ry. Co. and for Atlantic Coast Line R. Co.

. William C. Burger, of Louisville, Ky., for Louisville & N. R. Co.

James J. McLaughlin, of Johnson City, Tenn., for Carolina, C. & O. Ry., for Carolina, C. & O. Ry. of South Carolina, and for Clinchfield Northern Ry. of Kentucky.

GLENN, District Judge.

This bill in equity presents in a new form a controversy which has already been before the courts. Piedmont & N. R. Co. v. U. S. (D. C.) 30 F.(2d) 421. It grows out of the proposed extension of the lines of the Piedmont & Northern Railway. It involves one major question, although the range of investigation and consequent testimony is very wide. This question may be summed up in a few words, viz.: Does the Interstate Commerce Commission have jurisdiction over this particular railroad for the purpose of granting or refusing certificates of public convenience and necessity for proposed extensions of line? The question may be stated another way with reference to the particular statute involved, viz.: Does this particular railroad, Piedmont & Northern,

come within the special exemptions which paragraph 22 of section 1 of Interstate Commerce Act as added by section 402 of Transportation Act 1920, 49 USCA § 1 (22), makes from the general powers of the Interstate Commerce Commission over abandonments and extensions of the lines of existing railroads?

Paragraphs 18 to 21 of section 1, title 49, United States Code Annotated, govern the Commission's authority and the procedure thereunder with reference to proposed constructions and proposed abandonments. Paragraph 22 sets out limitations on the authority of the Interstate Commerce Commission. It provides: "The authority of the commission conferred by paragraphs (18) to (21), both inclusive, shall not extend to the construction or abandonment of spur, industrial, team, switching, or side tracks, located or to be located wholly within one State, or of street, suburban, or interurban electric railways, which are not operated as a part or parts of a general steam railroad system of transportation."

As was pointed out in the opinion of the three-judge court which heard this controversy in another proceeding [(D. C.) 30 F. (2d) 421], the question is, whether or not this particular Piedmont & Northern Railroad comes within the second group excluded from the control and authority of the Interstate Commerce Commission. That is, does it come within the phrase "interurban electric railways which are not operated as a part or parts of a general steam railroad system of transportation?" As was pointed out in the opinion of the three-judge court, a minor question of statutory construction is presented, which, in our opinion, may be very easily answered. This minor question arises under the terms of paragraph 18, which provides that the certificates of public convenience and necessity are not necessary where the particular extension was "undertaken" before the dead-line of May 28, 1920.

The history of the application for a proper certificate and the action of the commission thereon is fully set forth in the opinion of the three-judge court, which heard the former bill dealing with this controversy. While it is true that due application was made by the Piedmont & Northern Railway Company for such certificate of public convenience and necessity, this application was made with the distinct understanding that the Piedmont & Northern was not waiving its position, that it was not subject to the

jurisdiction of the Interstate Commerce Commission with reference to the proposed extension. The Commission refused to grant the certificate and the matter was taken before the three-judge court as referred to above. In a very able and accurate opinion, Judge Soper, sitting as a member of the court, points out the problem of statutory construction and reviews the evidence. The decision of the three-judge court was that the Commission did have jurisdiction over the Piedmont & Northern Railway Company. This decision was founded on the principle that while the Piedmont & Northern might at first view come within the terms of the exclusion paragraph, yet when all of the facts were considered in the light of the spirit of the whole Transportation Act (41 Stat. 456), it was clear that Congress intended to give the Interstate Commerce Commission jurisdiction over a railroad of the nature, character, and history of the Piedmont & Northern. Appeal was taken to the United States Supreme Court from the decision of the three-judge court. The United States Supreme Court, in an opinion by Mr. Justice Brandeis, decided that the three-judge court had no jurisdiction over the bill before them. This opinion is reported in 280 U. S. at page 473, 50 S. Ct. 192, 194, 74 L. Ed. 551. There it is pointed out that the action of the Commission in refusing to give the desired certificate was a negative order, and one which was not subject to review by the three-judge court. The closing paragraphs of the opinion are:

"Since plaintiff's bill was dismissed on the merits when it should have been dismissed for want of jurisdiction, the decree must be reversed with directions to dismiss the bill for want of jurisdiction. Smallwood v. Gallardo, 275 U. S. 56, 62, 48 S. Ct. 23, 72 L. Ed. 152; Shawnee Sewerage & Drainage Co. v. Stearns, 220 U. S. 462, 471, 31 S. Ct. 452, 55 L. Ed. 544; Blacklock v. Small, 127 U. S. 96, 105, 8 S. Ct. 1096, 32 L. Ed. 70. Compare United States v. Anchor Coal Co., 279 U. S. 812, 49 S. Ct. 262, 73 L. Ed. 971; Gnerich v. Rutter, 265 U. S. 388, 393, 44 S. Ct. 532, 68 L. Ed. 1068; Brownlow v. Schwartz, 261 U. S. 216, 218, 43 S. Ct. 263, 67 L. Ed. 620.

"Reversed with direction to dismiss the bill for want of jurisdiction."

In the light of the opinion of the United States Supreme Court, the Piedmont & Northern concluded that it could ascertain its legal position with reference to paragraph 22 of section 1 of the Interstate Commerce Act as added by section 402 of the Transportation Act by actually starting construction. Accordingly, a meeting of the board of directors was held, and the minutes of this meeting are recorded in the following terms:

"Resolutions Adopted at Special Meeting of Board of Directors of Piedmont and Northern Railway Company, Held at Greenville, South Carolina, on March 10, 1930.

"Mr. W. S. Lee, the President of the Company, stated that the meeting had been called for the purpose of discussing with the Directors the opinion the United States Supreme Court delivered February 24, 1930, in the case of Piedmont & Northern Railway Co. v. United States, Interstate Commerce Commission, Southern Railway Company, and others, involving the Company's right to complete its lines, and of advising with the Directors about the steps to be taken in view of the decision and opinion of the court. He laid before the Board a copy of the opinion, and stated that he was advised by counsel of the company that the decision of the court does not determine the Company's right to proceed with the completion of its lines, but leaves this question for future determination in the event the right to complete the lines should be further denied and contested. He called attention to the statement in the opinion that the right of the Company to proceed with the proposed construction is not affected or controlled by the ruling of the Interstate Commerce Commission in its report of April 3, 1928, and read to the Board the following language from the Opinion: 'Neither the assumption of jurisdiction by the Commission nor its denial of the application can operate as res judicata of the railway's claim of immunity. If, as is contended, the Commission was without jurisdiction, the railway is as free to proceed with the construction as if the application had not been made and the Commission had not acted. Nothing done by the Commission can prejudice the railway's claim to immunity in any other proceeding.'

"The matter was thereupon thoroughly discussed in detail by all of the Directors present.

"Upon motion of Capt. E. A. Smyth, duly seconded by Mr. A. F. McKissick, the following resolution was unanimously adopted: 'Be it resolved, That the completion of the lines of the company as the same were originally projected and planned to extend through the Piedmont section of North and South Carolina from Greenwood and Ander-

son on the South, to Durham and Winston-Salem on the North, not be abandoned, and said original plan and project is hereby reaffirmed and approved.'

"Upon motion of Mr. J. P. Gossett, duly seconded by Mr. J. H. Separk, the following resolution was unanimously adopted: 'Be it resolved, That the officers of the company be, and they hereby are, directed and instructed to proceed toward the completion of the lines of the company as originally planned and projected, by forthwith commencing construction upon and prosecuting to completion, with due diligence and dispatch, the line from Spartanburg, South Carolina, to Gastonia, North Carolina, which will connect and join together the existing lines of the company.'

"I, J. C. McGowan, Secretary of Piedmont and Northern Railway Company, hereby certify that the foregoing is a true and correct transcript from the minutes of special meeting of Board of Directors of Piedmont and Northern Railway Company, held at Greenville, South Carolina, on March 10, 1930, and that said meeting was duly called and held in all respects in accordance with the laws of the State of South Carolina and by-laws of the Company, and that a quorum was present.

"In Witness Whereof, I have hereunto set my hand and affixed the seal of said corporation, this 11th day of March, A. D. 1930.

"[Signed] J. C. McGowan, Secretary. [Seal.]"

Pursuant to this resolution, actual construction of the Spartanburg to Gastonia link was started, work being done at both ends. This turned the tables, and the Interstate Commerce Commission became the actor. The Commission applied to this court for leave to file its bill in equity and for a temporary restraining order restraining the Piedmont & Northern from proceeding with the construction. The bill was filed. Of course, the contention of the Commission is that the Piedmont & Northern is subject to its jurisdiction, and is not within the exclusion paragraph 22, § 1 (49 United States Code Annotated). The defendant has answered, taking substantially the same legal position which it took before.

In the meantime, the Southern Railway Company, Charleston & Western Carolina Railway Company, Atlantic Coast Line Railroad Company, Louisville & Nashville Railroad Company, Carolina, Clinchfield & Ohio Railway, Carolina, Clinchfield & Ohio Railway of South Carolina, and Clinchfield Northern Railway Company of Kentucky have, with leave of court, intervened as parties plaintiff. With the pleadings in this shape, the controversy has, in the opinion of this court, properly come before it as a bill in equity. It is conceded by all parties to the suit that the situation does not demand a three-judge court, and it seems that the controversy is now in the form of an "appropriate proceeding."

A hearing on the merits was had at a special term of the court in Spartanburg, S. C., which lasted for two weeks. At this hearing the testimony was taken which was in many respects the same testimony which had been taken before the Commission at the time of the hearing on the original application of the Piedmont & Northern for its certificate of public convenience and necessity. The testimony developed fully the history of the defendant, its nature, its construction, its method of operation, and the classes of traffic handled. We have endeavored to summarize the evidence in independent findings of fact which we are filing along with this opinion under the terms of Equity Rule 70½ (28 USCA § 723). In these separate findings of fact we have classified our conclusions according to the following classifications:

1. Corporate history of the Piedmont & Northern Railway Company from early organization up to May 28, 1920, the date when paragraph 18 of section 1 of the Transportation Act (49 USCA) became effective.

2. The type of construction of the tracks, bridges, roadbed, and terminals of the Piedmont & Northern Railway.

3. The rolling stock and other mobile equipment used by the Piedmont & Northern Railway Company.

4. An analysis of the traffic handled and the methods of operation.

5. The probable effect of the proposed extensions from Spartanburg, S. C., to Gastonia, N. C., and from Charlotte, N. C., to Winston-Salem, N. C., and of either one of these extensions.

6. The facts as to the threatened construction.

7. The history of the application by Piedmont & Northern Railway Company for a certificate of public convenience and necessity under the terms of the Transportation Act, paragraphs 19 and 20 (title 49 USCA), and the resulting judicial proceedings, heretofore had, in the District Court (three

judges sitting) under the terms of the Urgent Deficiencies Act, and the appeal to the United States Supreme Court.

With these facts all before the court, we come back to the same propositions which confronted the three-judge court in passing upon this matter before. We admittedly quote from the analysis of these questions as stated by Judge Soper, with one change, the word "petitioner" to the word "defendant," in order to make the questions stand in their proper reference to the parties as they are present in this suit.

"Two substantial questions arise:

"(1) Did the defendant, within the meaning of paragraph 18, undertake the proposed extension of its lines before the expiration of 90 days after February 28, 1920, when the Transportation Act went into effect?

"(2) Is the defendant, within the meaning of paragraph 21, an interurban electric railway which is not operated as a part of a general steam railroad system of transportation?"

This court has carefully gone over the entire testimony and attempted to make its independent decision on these questions quite apart from any influence of the decision as rendered by the three-judge court, one for which we naturally have great respect. In such investigation we come to the conclusion that we must answer these questions in the same way that they were answered before, and we therefore come to the conclusion that the Interstate Commerce Commission does have jurisdiction over the Piedmont & Northern Railway with reference to proposed abandonments and construction.

With reference to the first question presented, viz., as to whether or not the proposed extensions had been undertaken before May 28, 1920, we agree with the statement of the evidence and the conclusions of law as stated in the opinion of the three-judge court. We point out here that the interruption in the original plans of construction as made by the Piedmont & Northern were interruptions resulting from the World War, and its effect on business generally. More definitely the World War resulted in the government operation and control of the railroads, and the defendant here was one of the systems which the government found necessary to take over. The history of the government operation and the resulting Transportation Act of 1920 are interesting matters of history which it is not necessary to review in this opinion. But from whatever cause these plans were interrupted, there is no doubt that between 1912 and 1926 the defendant had not taken such definite steps towards the construction of these proposed extensions as to come within what we take to be the meaning of the word "undertaken" as used in this act. We have examined the authorities cited by Judge Soper in his opinion, and adopt them as part of this opinion. Indeed, the defendant itself seems to have agreed that this is the proper conclusion from the facts, because on appeal to the United States Supreme Court from the previous decision it appears that it practically abandoned this contention, the opinion of the court stating: "The plaintiffs have also abandoned, in this Court, their contention that the proposed extensions are part of a project undertaken prior to the effective date of paragraph 18. Their sole contention is that the court below and the Commission erred in not holding that the railway is an interurban electric railway within the exemption of paragraph 22. The defendants renew their objections to the jurisdiction of the court."

Before leaving this phase of the case, however, we think it well to point out that the Commission has adopted a general rule of interpretation with reference to deciding whether or not an extension was "undertaken" before the date, May 28, 1920. In these decisions they have pointed out that there must be something more than a mere intention to build a line in order to bring the proposed extension within the meaning of the word "undertaken." A number of these cases might be cited. The standard as set by the Commission, and adhered to with reasonable certainty, was set in its order of date May 25, 1920, three days before the ninety-day limit expired.

"The Transportation Act was approved, and said paragraph took effect, on February 28, 1920, and therefore the provisions of the paragraph apply to all extensions, constructions, acquirements and operations, and to engaging in transportation under the Act after *May 28, 1920,* and also to abandonments of all or any portion of a line of railroad, or the operation thereof, after said last mentioned date. Inquiries have been made of the Commission as to whether or not certificates of convenience and necessity are required in cases where the extension or construction has been undertaken but the work has not been completed on May 28, 1920.

"The Commission holds that if the projected extension or construction is actually undertaken in good faith on or before ninety

days after the approval of the Transportation Act, 1920, by a carrier subject to the Interstate Commerce Act which will operate the line, certificate will not be required of such carrier either for extension or construction or for acquirement, operation or engaging in transportation under the Act, but the undertaking must embrace not merely purpose or intent to extend or construct, but also the actual doing in good faith of acts calculated to completely effect such purpose.

"All carriers contemplating or engaged in such work should immediately notify the Commission of all the facts and circumstances connected therewith in order that the Commission may determine whether or not the work has been *actually undertaken* as contemplated by the Act and whether or not a certificate of convenience and necessity will be required.

"The Commission further holds that the mere provision in a charter or prospectus, or the making of a preliminary survey for the extension or construction of a line of railroad, does not constitute an undertaking of such extension or construction. * * *"

Of course, it is clearly understood that it was not within the power of the Commission, by its administrative order, to set the standard by which a court would be governed in construing this feature of the statute. We do, however, feel that the wording of the Commission's order is a fair, reasonable, and correct interpretation of the statute. We find, further, that it is one which has been followed by several courts, and one which we feel constrained to adopt. It appears that the United States Supreme Court has never addressed itself to the precise point of construing the word "undertake" as used in paragraph 18. So the court has not set for us a standard as to what facts would be construed as an "undertaking" prior to the time limit, such as to give a specific railroad the benefit of the freedom from the Commission's authority. But it has fully enunciated the fundamental rules for the construction of the Transportation Act, and it has elaborated the remedial purposes sought to be achieved by this legislation. It has held that the true guide to the construction of the statute is found in the consideration of such purposes. This rule will be best followed when the remedial provisions of the statute are liberally construed and the express exceptions strictly construed. It would be violative of this spirit of construction if we were to give a broad and liberal meaning to the exceptions so as to remove from the absolute prohibition of the statute a definite extension on which work was actually begun many years after the time limit, merely because it may have been planned, projected, or intended prior to the time limit. Railroad undertakings are generally more ambitious in their origin than they become in completion for decades. In this very territory is a road named Charleston, Cincinnati & Chicago, with a charter setting out fully such an ambitious undertaking. A half century has elapsed and this railroad has reached neither Charleston on the one end, nor Cincinnati and Chicago on the other. Any broad and liberal interpretation of the ambitions, past intentions, purposes, plans, and schemes of boards of directors of new railroads as constituting actual undertakings prior to the time limit, would nullify the very purposes sought to be accomplished by the Transportation Act. If such a rule of interpretation were to be uniformly adopted by the courts of the nation, the allowed extensions would be so generally permitted on this theory that the Commission would have practically no authority over the building of new lines of railroad.

It is pointed out by the defendant that the directors and other stockholders, when they purchased stock in the Piedmont & Northern, did so with the idea that the present extensions under discussion would be built. It is suggested, therefore, that the restriction of the Piedmont & Northern to its existing lines is in impairment of contract. We agree that the Transportation Act may work a hardship on these particular stockholders, and perhaps as great a hardship in the case of the Piedmont & Northern as of any other carrier, but such hardship does not mean that contracts have been impaired so as to render the statute unconstitutional. See Louisville & N. R. Co. v. Mottley, 219 U. S. 467, 31 S. Ct. 265, 55 L. Ed. 297, 34 L. R. A. (N. S.) 671. There the Supreme Court held that the contract which Motley had entered into with the Louisville & Nashville was entered into with the railroad with full knowledge that railroads were, under the Federal Constitution, subject to regulation by Congress, and that the contract, though valid and enforceable when made, could be, and was, rendered invalid by the subsequent regulatory act of Congress. In the same way, contracts which were entered into with the Piedmont & Northern by subscriptions to the syndicate agreement or purchases of shares of stock, which may have been made in reliance upon the intention to build a more extensive line of railroad, were entered into

with full knowledge that this interstate carrier could be regulated by the Federal Congress. Not only was the Piedmont & Northern subject to be regulated by Congress, but during the war period it was actually taken over and operated by the government as a means of expediting the transportation necessary for war purposes. The Transportation Act, with the large powers which it gave to the Commission, was the death knell to many pet schemes, plans, and ambitions of railroad promoters, and this court, in construing the act, cannot deviate from a plain rule of construction because of the hardship resulting to one individual corporation. The Transportation Act fell, as the axe of the guillotine, suddenly and effectively upon many of the railroad systems of this country.

Again, in considering the history of the Piedmont & Northern, we cannot overlook the fact that it was tied up, so far as its successful construction and operation were concerned, with the personality of Mr. James B. Duke. Mr. Duke was the man who, in the last analysis, was making the railroad possible, and without his assent and aid no construction would have been undertaken. In the specific findings of fact in this case, we have pointed out that while some of the directors were at all times anxious to extend the lines of the Piedmont & Northern, they had great difficulty in getting Mr. Duke to authorize such extension. The testimony and the written exhibits, in our opinion, fully justify the conclusion that from 1914 until 1920, Mr. Duke never had any well formed intention of beginning actual construction on either the Spartanburg-Gastonia link or the Charlotte-Winston-Salem extension. Mr. Duke died in 1925, and the fact that no actual construction was entered upon until after his death corroborates the view that his dominating influence was never exerted in behalf of definite extension before the year 1920.

A very resourceful argument is made by the defendant, which may be briefly stated in this language, viz., that the Piedmont & Northern was an essential part of the Duke enterprises in Piedmont Carolinas; that from 1910 until 1920 active construction of some part of the Duke enterprises was constantly going on. From this we are asked to conclude and hold as a matter of law that the construction of the railroad was, therefore, never at any time abandoned; that as the construction of the whole scheme was constantly under way, we cannot say that the construction of any integral part was ever abandoned. It is true that during the years from 1914 to 1920, the Duke Power Company and affiliated interests were building hydroelectric plants, power lines, cotton mills, and were expending millions of dollars in educational and charitable institutions. It is true that the Piedmont & Northern is owned by the same interests, and that it serves territory in which the Duke interests are located. But the facts remains that Mr. Duke, during these years, never took any very definite steps towards extending the lines of the Piedmont & Northern Railway.

We now come to the consideration of the major question involved in this case as it has been stated above. We come to the conclusion that the defendant is such a railroad as to fall without the meaning of the exception of paragraph 22, section 1, of the Interstate Commerce Act as added by section 402 of the Transportation Act. The whole problem may be summed up in a few words. Manifestly, if we construe the terms of paragraph 22 in a literal, dictionary, and etymological sense of the words used, the Piedmont & Northern would fall within such a meaning of the words as used. The statute says that the requirements of paragraphs 18 to 21 shall not apply to "interurban electric railways, which are not operated as a part or parts of a general steam railroad system of transportation." The Piedmont & Northern is certainly an interurban railway in the sense that it runs between cities. It is certainly an electric railway, in that its equipment and trains are motivated by electric power. We finally conclude that while it is closely tied up by existing traffic agreements, some of them highly preferential, yet its independence of control and operation is such as to keep us from saying that it is operated as a part of any general steam railroad system of transportation. But if we allow such a literal construction to control us, we cannot help but feel that we would be flying directly in the face of the remedial purpose of the entire Transportation Act. We feel, further, that to do so would be to disregard the rule of construction of this particular statute which has been laid down for us by the United States Supreme Court. Further than that, the help which we have been able to get from the reports of committees and debates in Congress when the Transportation Act was being considered, clearly indicates that Congress never intended to deprive the Commission of jurisdiction over extensions by a major interstate carrier of such importance as the Piedmont & Northern is shown to be.

We will present first our views as to the construction of the Transportation Act by the United States Supreme Court. Manifestly, we cannot go into all of the many cases in which this important legislation has been construed by that high court, but in each instance, when the statute has been before the court for construction, the court has construed the statute in the light of the remedial purposes of this legislation.

The first case involved the power of the Interstate Commerce Commission to remove discrimination against persons and localities. There suit was brought to enjoin state regulatory officers from interfering with the rates which were fixed by the Federal Interstate Commerce Commission. The Supreme Court sustained the injunction, and in the course of the opinion rendered by the late Chief Justice Taft, Railroad Commission of State of Wisconsin v. Chicago, B. & Q. R. Co., 25 U. S. 563, 42 S. Ct. 232, 236, 66 L. Ed. 371, 22 A. L. R. 1086, the general purposes of the act were outlined:

"From January 1, 1918, until March 1, 1920, when the Transportation Act went into effect, the common carriers by steam railroad of the country were operated by the Federal Government. Due to the rapid rise in the prices of material and labor in 1918 and 1919, the expense of their operation had enormously increased by the time it was proposed to return the railroads to their owners. The owners insisted that their properties could not be turned back to them by the Government for useful operation without provision to aid them to meet a situation in which they were likely to face a demoralizing lack of credit and income. Congress acquiesced in this view. The Transportation Act of 1920 was the result. It was adopted after elaborate investigations by the Interstate Commerce Committees of the two Houses. * * *

"It is manifest from this very condensed recital that the act made a new departure. Theretofore the control which Congress through the Interstate Commerce Commission exercised was primarily for the purpose of preventing injustice by unreasonable or discriminatory rates against persons and localities, and the only provisions of the law that inured to the benefit of the carriers were the requirement that the rates should be reasonable in the sense of furnishing an adequate compensation for the particular service rendered and the abolition of rebates. The new measure imposed an affirmative duty on the Interstate Commerce

Commission to fix rates and to take other important steps to maintain an adequate railway service for the people of the United States. This is expressly declared in section 15a to be one of the purposes of the bill."

Another clear statement of the fundamental purposes of this legislation is found in the opinion of Mr. Justice Brandeis, in the New England Divisions Case, 261 U. S. 184, 43 S. Ct. 270, 273, 67 L. Ed. 605. There an express provision of the statute dealing with the division of rates was construed in the light of the remedial purposes of the whole legislation. Mr. Justice Brandeis said:

"Transportation Act 1920, introduced into the federal legislation a new railroad policy. Railroad Commission v. Chicago, B. & Q. R. Co., 257 U. S. 563, 585, 66 L. Ed. 371, 382, 22 A. L. R. 1086, 42 S. Ct. 232. Theretofore, the effort of Congress had been directed mainly to the prevention of abuses, particularly those arising from excessive or discriminatory rates. The 1920 act sought to insure, also, adequate transportation service. That such was its purpose Congress did not leave to inference. The new purpose was expressed in unequivocal language. And, to attain it, new rights, new obligations, new machinery, were created. The new provisions took a wide range. Prominent among them are those specially designed to secure a fair return on capital devoted to the transportation service. Upon the Commission new powers were conferred, and new duties were imposed.

"The credit of the carriers, as a whole, had been seriously impaired. To preserve for the nation substantially the whole transportation system was deemed important."

Similar quotations might be made from many other cases, particularly Dayton-Goose Creek Railway v. United States, 263 U. S. 456, 44 S. Ct. 169, 68 L. Ed. 388, 33 A. L. R. 472. But all of these cases were referred to and discussed in the previous opinion by the three-judge court, which is reported in (D. C.) 30 F.(2d), at page 429, 430 and 431. This opinion going over the same ground, and deciding the same questions in the same way, admittedly tracks the former decision of the three judges, both in view of the law and in statement of the evidence. We respectfully submit, however, that the question as we see it, is not reducible to the single inquiry as to whether or not the Piedmont and Northern is an "interurban railway." We think a more accurate statement of the question is whether the Piedmont &

Northern, although literally an interurban electric railway, not operated as part of a general steam railroad system, possesses so many of the characteristics and functions of a great interstate carrier as to negative any conclusion that Congress ever intended to exempt a railroad of its type and magnitude from regulation by the Interstate Commerce Commission with respect to control over abandonments and extensions. However we reason about the words "interurban" and "electric," the Piedmont & Northern comes within the prima facie meaning of each of these words. It has been so denominated both as a matter of common designation by the public and of classification in railroad circles. It was and has been referred to as "interurban" by court and commission, state and federal. Even the Interstate Commerce Commission, itself, has for many purposes classified it as an interurban railway, and on the trial of this case documents were introduced wherein the Commission had, in referring to the Piedmont & Northern, referred to it as an interurban railway.

■ It is not, as we see it, a contest to be waged over the word "interurban" and its meaning, but it is a decision of the question of whether or not paragraph 22, when construed in the light of the whole Transportation Act, can be said to include within its terms the Piedmont & Northern Railroad, when due regard is given to its history, its physical characteristics, its method of operation, the character of traffic handled, and its importance as an interstate carrier viewed from a national standpoint.

We feel that the case which gives us the most help, and the one which really has caused this court to come to the conclusion announced, is a case which construes the other clause in the particular amendment which we are here called upon to construe. The entire paragraph 22 reads as follows: "The authority of the commission conferred by paragraphs (18) to (21), both inclusive, shall not extend to the construction or abandonment of spur, industrial, team, switching, or side tracks, located or to be located wholly within one State, or of street, suburban, or interurban electric railways, which are not operated as a part or parts of a general steam railroad system of transportation."

The Supreme Court has had occasion to construe the meaning of "spur, industrial, team, switching, or side tracks, located or to be located wholly within one State." We, therefore, submit that the best authority for the construction of the remaining words of this paragraph is the construction which the United States Supreme Court has placed upon the phrase just quoted. We refer to the case of Texas & Pacific Railway Co. v. Gulf, Colorado & Santa Fé, 270 U. S. 266, 46 S. Ct. 263, 266, 70 L. Ed. 578. The court in that case laid down the true guide for the construction of paragraph 22. It held that the guide was to be found in the context in which the language was used, and in the relation of the specific provisions to the railroad policy and legislative purpose introduced by the Transportation Act. If the court in that case had "stuck in the bark" of the particular word used, had given to that word in this exclusion provision a purely literal meaning, the track sought to be built by the Gulf, Colorado & Santa Fé would have been an "industrial track" just as much as the defendant in this case would be an "interurban electric railway" within a strictly literal interpretation of that expression.

■ The Supreme Court, in the Texas & Pacific Case, did not allow their interpretation of the meaning of "industrial track" to be controlled by arguments based on the rulings of the Commission as to what were industrial tracks, or by the sense in which railroad companies had loosely employed this expression. If they had been guided by such considerations, they would assuredly have held that the proposed track of only seven and one-half miles was an industrial track. But the Supreme Court expressly repudiated these considerations, and took as its guide the real purpose which the extension would serve. They held that it was not an industrial track, but a real extension for which a certificate had first to be procured from the Interstate Commerce Commission before construction would be allowed, because of the effect which this extension would have on the rival railroad companies. We quote fully from this case:

"A truer guide to the meaning of the terms 'extension' and 'industrial track,' as used in paragraphs 18 to 22, is furnished by the context and by the relation of the specific provisions here in question to the railroad policy introduced by Transportation Act of 1920. By that measure, Congress undertook to develop and maintain, for the people of the United States, an adequate railway system. It recognized that preservation of the earning capacity, and conservation of the financial resources, of individual carriers, is a matter of national concern; that the property employed must be permitted to earn a reasonable return; that the building of un-

necessary lines involves a waste of resources, and that the burden of this waste may fall upon the public; that competition between carriers may result in harm to the public, as well as in benefit; and that, when a railroad inflicts injury upon its rival, it may be the public which ultimately bears the loss. See R. R. Com. v. C., B. & Q. R. R. Co., 257 U. S. 563, 42 S. Ct. 232, 66 L. Ed. 371, 22 A. L. R. 1086; The New England Divisions Case, 261 U. S. 184, 43 S. Ct. 270, 67 L. Ed. 605; The Chicago Junction Case, 264 U. S. 258, 44 S. Ct. 317, 68 L. Ed. 667; R. R. Com. v. Southern Pacific Co., 264 U. S. 331, 44 S. Ct. 376, 68 L. Ed. 713. The act sought, among other things, to avert such losses.

"When the clauses in paragraphs 18 to 22 are read in the light of this congressional policy, the meaning and scope of the terms 'extension' and 'industrial track' become clear. The carrier was authorized by Congress to construct, without authority from the Commission, 'spur, industrial, team, switching or side tracks * * * to be located wholly within one state.' Tracks of that character are commonly constructed, either to improve the facilities required by shippers already served by the carrier or to supply the facilities to others, who being within the same territory and similarly situated are entitled to like service from the carrier. The question whether the construction should be allowed or compelled depends largely upon local conditions, which the state regulating body is peculiarly fitted to appreciate. Moreover, the expenditure involved is ordinarily small. But where the proposed trackage extends into territory not theretofore served by the carrier, and particularly where it extends into territory already served by another carrier, its purpose and effect are, under the new policy of Congress, of national concern. For invasion through new construction of territory adequately served by another carrier, like the establishment of excessively low rates in order to secure traffic enjoyed by another, may be inimical to the national interest. If the purpose and effect of the new trackage is to extend substantially the line of a carrier into new territory, the proposed trackage constitutes an extension of the railroad, within the meaning of paragraph 18, although the line be short, and although the character of the service contemplated be that commonly rendered to industries by means of spurs or industrial tracks. Being an extension, it cannot be built unless the federal Commission issues its certificate that public necessity and convenience require its construction. The Hale-Cement Line is clearly an extension within this rule."

Such is the construction placed upon one-half of paragraph 22. It is only logical to apply the same construction to the remaining portions of the same paragraph. Noscitur a sociis. Congress bracketed these phrases together, and it would be highly illogical to apply one rule of construction to one phrase and a different rule to the other.

Now, when we study the legislative history of paragraph 22, the close connection between the two groups referred to in this paragraph of exclusion becomes even more apparent. Indeed, as the Transportation Act was first written, the phrase "wholly within one State" modified all of the other phrases in the paragraph. The "wholly within one State" was a limitation on the phrase, "street, suburban or interurban railways which are not operated as a part or parts of a general steam railroad system of transportation," as well as upon the phrase, "spur, industrial, team, switching, or side tracks." In other words, to make a long story short, the original purpose of paragraph 22 was to reserve to the state some rights to regulate transportation within its own borders. The state regulatory bodies organized themselves into a national organization. They sent representatives to Washington to appear before the committees drafting the Transportation Act. Their whole purpose was, of course, to retain some authority for themselves. Likewise, the strong advocates of States' Rights were insistent that some control of commerce, at least intrastate, be left with the state governments. Through all of these proceedings the question of location within one state was the dominating consideration, it being conceded that where a carrier was one of national importance and scope, it was subject to regulation by Congress only, and therefore would properly fall, for all purposes, under the jurisdiction of the Interstate Commerce Commission. After studying this record, and in the greatest detail, we come to the conclusion that the reason for the transposition of the phrase "wholly within one state" from the end of paragraph 22 to the middle thereof, is easily explained. This transposition was supported, it is seen, by the gentlemen representing certain states. A study of these states shows that in each case they were states where some of their territory was closely adjacent to a large city located within the borders of another state. Indiana's location with reference to Chicago is a typical illustration. When this amendment is seen in the

light of this history, it is clear that the purpose of the amendment was to deal with local situations, and it in no way evidences a serious intention of depriving the Interstate Commerce Commission of jurisdiction and its control for abandonment and construction purposes over any important interstate carrier whose general transportation of interstate freight was so large as to make it a carrier of national importance.

The Interstate Commerce Commission and the intervening railroads have in their arguments and presentation of the testimony magnified the connection of the Piedmont & Northern with certain other railways. They have furthermore magnified the intimacy between the Piedmont & Northern and the other Duke interest in Piedmont Carolinas. They point out in general and specific terms the extent to which traffic is controlled by an existing agreement between the Piedmont & Northern and the Seaboard Air Line Railway. This agreement governs the interchange of freight at Greenwood, S. C. The results of this agreement are no doubt felt very seriously by the Southern, the Coast Line and its affiliated lines, and even by the Louisville & Nashville. We have allowed the evidence along this line to be introduced and consider it important, in that it shows the nature of traffic handled by the Piedmont & Northern Railroad Company, and therefore goes to show its importance as an interstate carrier. The question of the extent of such injury suffered from this agreement is primarily one for the Commission to have in mind when it passes upon the wisdom of granting or denying its certificate, but we think that it is proper evidence before this court to aid it in the solution of the question as to whether or not Congress intends to exempt a railroad of the nature and of the importance of the Piedmont & Northern Railroad Company from the requirements of paragraphs 18 to 21, of § 1 of Interstate Commerce Act as added by section 402 of the Transportation Act.

The convincing evidence also shows the amount of freight which the extension from Charlotte to Winston-Salem would take away from the present railroads serving that territory. This, too, is a consideration primarily for the Interstate Commerce Commission, but the fact that such an extension would control the earning of millions and millions of dollars of revenue does show that the Piedmont & Northern as it now exists is a railroad of such importance from a national standpoint as to negative any idea that its proposed extensions are matters of purely local interest. As an example of the figures involved, it is pointed out that the Southern now derives $750,000 a year in revenue from coal hauled to one of the Duke steam plants near Salisbury, N. C. Of course, if the Winston-Salem extension is built parallelling, as it will, the Southern, this freight will be handled by the Duke-owned railway, and the Southern will lose this enormous revenue. We might cite many such illustrations of the direct effect of the affiliation of the Piedmont & Northern Railway with other Duke interests.

The intervening plaintiffs also stress the intimacy between the Piedmont & Northern and the Durham & Southern. It is pointed out that although there is no physical connection between these two railroads, and although the Durham & Southern was in very bad condition until it came under the control and supervision of the corporate officers of the Piedmont & Northern, that so great had been the benefit derived from affiliation with the Piedmont & Northern that now the Durham & Southern is actually in the recapture class. We think that the intervening plaintiffs have magnified this connection to the point of making a mountain out of a mole hill, but at the same time it is just another illustration of the fact that the Piedmont & Northern is now an important factor in through freight transportation, and that with the proposed extensions it would become such an important line of railway as to injure seriously the three trunk lines now serving the Atlantic Seaboard in the handling of north and south traffic. A study of the maps will readily show that the tie-up from Winston-Salem to Charlotte, to Gastonia to Spartanburg, Greenville and Greenwood, thence via the Georgia & Florida, or by the Seaboard, would create another through line for north and south traffic. Of course, this new, through line is the real reason for the strenuous objection raised by the intervening carriers.

Finally, this court points out that it has carefully avoided the injection into this opinion, as well as into its deliberations over this case, of the economic considerations. We are not ignorant of the benefits which the Duke interests have conferred upon this section of the nation. From an industrial standpoint they have literally made the Piedmont Carolinas to blossom as a rose. Through the vision and philanthropy of Mr. James B. Duke, carried on after his death by the terms of the Duke Endowment, hospitals, universities, schools and orphanages are benefiting this

section beyond the dream of man, beyond anything that has ever been seen in this country before. Humanitarianism and business efficiency are joined in the development of the resources of this section, enlargement of educational and business opportunity, and in the alleviation of human suffering.

But all of these considerations have no place when we are faced with the direct problem of statutory construction, and when this problem of statutory construction arises out of a statute regulating interstate commerce, one of the fields specifically allotted to the Federal Congress by the Constitution of the United States, we must be controlled by the spirit of the Constitution, and by the spirit of the particular piece of legislation before us.

Likewise, we have divested our minds of any considerations of political philosophy. The wisdom of the Transportation Act is not for us at this time. Our problem is the construction of it, and we feel that we have followed the guide as laid down for us by the United States Supreme Court in the case of Texas & Pacific Railway Co. v. Gulf, Colorado & Santa Fe Railway Co., 270 U. S. 266, 46 S. Ct. 263, 70 L. Ed. 578.

For these reasons, which are based upon the findings of fact separately filed under the requirements of rule 70½ (28 USCA § 723), it is the opinion of this court that the Interstate Commerce Commission does have jurisdiction over the Piedmont & Northern Railway Company for the purposes set out in paragraphs 18 to 21, inclusive, of section 1 of the Interstate Commerce Act as added by section 402 of the Transportation Act 1920, and that therefore this court must grant its injunction against the further prosecution of any construction on the extensions from Spartanburg, S. C., to Gastonia, N. C., or from Charlotte, N. C., to Winston-Salem, N. C.

Let an appropriate order be submitted for signature.